2005  ME  31

**William D'ANGELO, Trustee et al.**

v.

**David McNUTT et al.**

Supreme Judicial Court of Maine.

Argued:  Jan. 11, 2005.
Decided:  Feb. 23, 2005.

John C. Bannon (orally), Murray Plumb & Murray, Portland, for plaintiffs.

John J. Wall III (orally), Monaghan Leahy, L.L.P., Portland, for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

RUDMAN, J.

[¶ 1] David and Karen McNutt appeal from a declaratory judgment entered in the Superior Court (Cumberland County, *Humphrey, D.C.J.*) determining the ownership of and easement rights in certain real property located in the Town of Standish on the shore of Sebago Lake in favor of Dr. Eugene and Marjorie D'Angelo and Dr. William D'Angelo, as trustee of

the Marjorie F. D'Angelo Qualified Personal Residence Trust Agreement (the D'Angelos). The parties' claims and counterclaims centered on the ownership of and easement rights in three disputed areas; Maine Avenue,[1] the Sebago Lake Shore Area,[2] and the Sucker Brook Area.[3] The trial court concluded that the McNutts had been the record title owners of all three areas, but that the D'Angelos had successfully acquired title to a portion of Maine Avenue and the Sebago Lake Shore Area by adverse possession.[4]

[¶ 2] The McNutts assert that the trial court erred when it found the D'Angelos had acquired title to the entire width of the northern portion of Maine Avenue; the court erred as a matter of law when it found the D'Angelos had acquired title to the Sebago Lake disputed area; and, alternatively, the court erred when it failed to find that the McNutts possessed private easement rights in all of the disputed property.

[¶ 3] Record title to the disputed areas is traceable to the great-grandfather of David McNutt, William Cole. In 1902, Cole began to convey parcels in the subdivision containing the property in dispute. As a result of those conveyances, by 1905, Edward Harmon owned all of the land on the westerly side of Maine Avenue from the lake to Sucker Brook Road and James Naylor owned the land that abutted Maine Avenue on its eastern side, except for the Sucker Brook disputed area. Between 1921 and 1928, Arthur and Marguerite Blake purchased all eleven parcels comprising the Harmon and Naylor properties. In August of 1964, the Blakes conveyed all of their property to the D'Angelos. Additionally, the Blakes conveyed to the D'Angelos any interest they may have acquired, by adverse possession or otherwise, to Maine Avenue, the Sebago Lake Shore Area, and the Sucker Brook Areas.

A. Adverse Possession

[¶ 4] The McNutts raise two arguments in opposition to the trial court's finding that the D'Angelos have acquired title to Maine Avenue and the Sebago Lake Shore Area by adverse possession. First, that there was insufficient evidence to establish that the D'Angelos had actually possessed these areas in their entireties, and second, the court erred as a matter of law when it concluded that the D'Angelos' use of the Sebago Lake Shore Area was anything other than permissive. We disagree.

1. Maine Avenue is a strip of land approximately thirty feet wide running in a north-northeasterly direction from where it begins, at the Sucker Brook Road, until it ends at the shore of Sebago Lake. The northern portion of Maine Avenue, from the gate erected by the D'Angelos in 1975 (the gate) to the shore of Sebago Lake, is abutted on both sides by the D'Angelos' property. The southern portion of Maine Avenue, from the gate to the Sucker Brook Road is abutted by the D'Angelos' property on its western side and the McNutts' and Tureks' properties on its eastern side.

2. The Sebago Lake Shore Area is the land abutting the D'Angelos' property to the north and the northeast. It consists almost entirely of lake banks and shoreland of Sebago Lake.

3. The Sucker Brook Area is a thin strip of shoreland abutted by the D'Angelos' property on its western boundary, the high water line of Sebago Lake on its northeastern boundary, Sucker Brook on its eastern boundary and property owned by the Tureks on its southern boundary.

4. The trial court made several other conclusions as well, including that the ownership rights to the southern portion of Maine Avenue had reverted to the abutting landowners as a result of abandonment, that the D'Angelos had not adversely possessed the Sucker Brook Disputed Area and that the Sebago Lake Shore Area was encumbered by the public's right to fish and fowl pursuant to the Colonial Ordinance of 1641. These conclusions are not challenged on appeal.

[¶ 5] To make out a prima facie case of acquisition by adverse possession, the party asserting adverse possession bears the burden of establishing, by a fair preponderance of the evidence, nine different elements representing various acts of dominion. *See Striefel v. Charles–Keyt–Leaman P'ship*, 1999 ME 111, ¶ 6, 733 A.2d 984, 989.

> A party claiming title by adverse possession ... must prove by a preponderance of the evidence that its possession and use of the property were: (1) actual; (2) open; (3) visible; (4) notorious; (5) hostile; (6) under a claim of right; (7) continuous; (8) exclusive; and (9) of a duration exceeding the twenty-year limitations period.

*Id.* (citation and quotation marks omitted).

[¶ 6] Whether acts of dominion are sufficient to establish acquisition of title by adverse possession is a question of law we review de novo. *See McGeechan v. Sherwood*, 2000 ME 188, ¶ 51, 760 A.2d 1068, 1079. However, whether those acts did in fact occur and under what circumstances they occurred are questions of fact. *See Striefel*, 1999 ME 111, ¶ 7, 733 A.2d at 989. Once the trial court has entered a judgment based upon findings of fact, unless additional findings of fact are requested pursuant to M.R. Civ. P. 52(a), we will infer that the trial court made all of the necessary subsidiary findings. *Lyons v. Baptist Sch. of Christian Training*, 2002 ME 137, ¶ 13, 804 A.2d 364, 369 (citations omitted). If the party claiming title by adverse possession prevailed at trial, "[t]he trial court's explicit and inferred findings of fact will be reviewed for clear error and will be affirmed if there is

competent evidence in the record to support the finding ... even if the evidence might support alternative findings of fact."[5] *Id.* (citation omitted).

[¶ 7] After a four-day non-jury trial, at which conflicting evidence was presented in many different forms, including but not limited to, lay testimony, expert testimony, photographs, maps, written correspondence and ancient documents, the record could have supported a verdict in favor of either party. However, the court found the D'Angelos more persuasive and concluded that they had established all of the elements of adverse possession by a fair preponderance of the evidence.

[¶ 8] Following entry of the judgment, neither party requested additional findings of fact pursuant to M.R. Civ. P. 52(a) and therefore, in addition to the court's express findings, we will infer that it made all the other findings necessary to support its conclusions. *See Lyons*, 2002 ME 137, ¶ 13, 804 A.2d at 369. When we review these express and inferred findings of fact for clear error, we find that they are supported by competent evidence in the record and must be upheld regardless of whether the record might also support reasonable alternative conclusions. *See id.*

1. Actual Possession

[¶ 9] In the present case, the most contentious factual finding necessary to support the court's decision was whether the D'Angelos had *actually possessed* the disputed portions of Maine Avenue and the Sebago Lake Shore Area in their *entireties*. The McNutts relied heavily upon *McGeechan*, which they urged was analogous to the present situation and stands

---

5. This standard, while highly deferential to the trial court's findings, is not as deferential as the standard applied when the trial court finds in favor of the party who does not bear the burden of proof. *See Jordan v. Shea*, 2002 ME 36, ¶ 22, 791 A.2d 116, 122 (holding that an easement by prescription was not established may be vacated only if the evidence before it clearly compelled a contrary holding).

for the proposition that the possession of a portion of a road does not result in the acquisition of the entire road by adverse possession. This is a correct statement of the law; adverse possessors typically only acquire that property which they actually possessed.[6] *See Striefel,* 1999 ME 111, ¶ 9, 733 A.2d at 989–90. However, the nature and extent of actual possession are factual issues to be determined by the trial court. *See id.* ¶ 7, 733 A.2d at 989. While the trial court in *McGeechan,* 2000 ME 188, ¶ 54, 760 A.2d at 1079–80, found that "there is scant evidence of the use of the *entire* Paper Mill Road by the McGeechans or by anyone else," the trial court in the present case found "[t]he evidence reflects that [the D'Angelos] have maintained immediate occupancy and control of Maine Avenue from the new gate to the lake's shore, and of the Sebago Lake Disputed Area ..." While the trial court did not use the word *entirety* in its written opinion, we will infer that it found such use extended to the entirety of those areas. Because this inference is supported by competent evidence in the record, we affirm it.[7]

6. An exception to this general rule is when possession occurs under color of title. *See John Wallingford Fruit House, Inc. v. MacPherson,* 386 A.2d 332, 334 (Me.1978) (stating that occupancy constructively extends to the whole of the land sufficiently described in the deed).

7. At trial, testimony describing the D'Angelos' activities in these areas was presented. This testimony could support a finding that the following activities took place in the Maine Avenue area: the D'Angelos made significant aesthetic and landscape improvements to the area of Maine Avenue, including the removal of trees and bushes, leveling of uneven ground and development of a lawn; they installed water wells in the area of Maine Avenue; they participated in sports and various recreational activities in the area of Maine Avenue; Maine Avenue was used as a parking area; no trespassing signs were posted

### 2. Hostile Possession

[¶ 10] The McNutts argue that the D'Angelos' use of the Sebago Lake Shore Area does not satisfy the requirement of hostility because it was permissive as a matter of law. We disagree.

[¶ 11] In support of their argument the McNutts cite to *Town of Manchester v. Augusta Country Club,* 477 A.2d 1124, 1130 (Me.1984), for the proposition that use of wild and uncultivated land is presumed to be permissive. This is a correct statement of the law in Maine and a minority of other states. *Id.* However, whether land is *wild and uncultivated* is a question of fact to be determined by the trial court. Findings of fact were not requested. We presume that the trial court found the Sebago Lake Shore Area was not wild and uncultivated. This finding is supported by competent evidence in the record relating to the D'Angelos' maintenance activities in that area and therefore we affirm the trial court's findings.

### B. Private Easement Rights

[¶ 12] The McNutts argue alternatively that they have retained private ease-

around the outer edges of the Maine Avenue area; snow fences were routinely put up across the entire area during the winter; finally, the D'Angelos made efforts to keep people out of the Maine Avenue area by erecting gates and other obstacles to block traffic.

Within the Sebago Lake Shore Area there is competent evidence to support the conclusion that the following activities took place: the D'Angelos rebuilt the retaining wall that runs the length of the shore; they raked the shore area to keep it free from debris; they blocked the boat landing to prevent boats from coming ashore; they placed large rocks in the water in front of the beach to prevent boat traffic; they posted no trespassing signs that faced towards the beach area to keep people off the beach; and finally, Eugene D'Angelo would confront any person he found in the beach area and tell them to leave.

ment rights to the disputed areas even if the D'Angelos have successfully acquired title by adverse possession. These easement rights, argue the McNutts, arise from two sources. First, by implication because they are owners of property within the same subdivision and second, by express grant as the result of conveyances. We disagree.

[¶ 13] Whatever private easement rights may have arisen as a result of express grants or implications were extinguished by abandonment. *See Rutland v. Mullen,* 2002 ME 98, ¶ 9, 798 A.2d 1104, 1109. "To make a prima facie showing of abandonment, the [party alleging abandonment] must establish: '(1) a history of nonuse coupled with an act or omission evincing a clear intent to abandon, or (2) *adverse possession by the servient estate.'*" *Id.* (quoting *Phillips v. Gregg,* 628 A.2d 151, 152 (Me.1993)) (emphasis added). The elements necessary to establish adverse possession by the servient estate are the same as those that must be proven when an adverse possessor attempts to deprive the true owner of a fee interest. *See Rutland,* 2002 ME 98, ¶ 11 n. 3, 798 A.2d at 1110. The acts of dominion performed by the D'Angelos with respect to the disputed areas were sufficient to extinguish any private easement rights possessed by the McNutts.

The entry is:

Judgment affirmed.