2006 ME 15

**MAINE EYE CARE ASSOCIATES P.A.**

v.

**Timber GORMAN.**

Supreme Judicial Court of Maine.

Argued: Sept. 13, 2005.

Decided: Feb. 17, 2006.

William D. Robitzek, Esq., Paul F. Macri, Esq. (orally), Berman & Simmons, P.A., Lewiston, for plaintiff.

Bernard J. Kubetz, Esq. (orally), F. David Walker IV, Esq., Eaton Peabody, Bangor, for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

SAUFLEY, C.J.

[¶ 1] Timber Gorman appeals from a judgment of the Superior Court (Kennebec County, *Studstrup, J.*), entered following a jury-waived trial, in favor of Maine Eye Care Associates P.A. on its claims against Gorman alleging unjust enrichment and fraudulent misrepresentation. Gorman argues that the findings of unjust enrichment and fraudulent misrepresentation lack adequate support in the record; that the court applied the wrong standard of proof for fraudulent misrepresentation; and that the court employed an arbitrary, unsupported, and improper measure of damages. Because we conclude that the court applied the wrong burden of proof, we vacate the finding of liability for fraudulent misrepresentation. We also vacate the court's finding of liability on the unjust enrichment claim because, as the parties agree, the court's finding that Gorman took MECA's patient files was clearly erroneous. Accordingly, we remand both the fraudulent misrepresentation and unjust enrichment counts for the trial court to reevaluate MECA's claims.

## I. BACKGROUND

[¶ 2] Except as indicated, the following facts found by the court are undisputed. In 1994, G. Madison Cravey, M.D., sold his ophthalmic practice in Ellsworth, which did not include real estate, to MECA for a little over $200,000. The purchase and sale agreement recognized that medical records and charts were being purchased, but the purchase price was allocated primarily to personal property for purposes of taking depreciation. After selling the practice to MECA, Cravey became an employee of MECA pursuant to an agreement dated December 30, 1994.

[¶ 3] In 1996, Timber Gorman, M.D., became a MECA employee in Ellsworth and began practicing as an ophthalmologist. Gorman entered into employment agreements on July 5, 1996, and August 26, 1997. Gorman's most recent employment contract, unlike Cravey's, included a provision that she would not practice medicine in competition with MECA if she either voluntarily separated from MECA or was dismissed. The noncompete provision would endure for eighteen months from

the date of termination or dismissal and within a thirty-mile radius of any MECA lab or office. The agreement provided that even if the termination or dismissal occurred after the expiration of the employment term, the noncompetition provision would apply.

[¶ 4] In 1998, MECA's chief executive officer proposed to Gorman that she enter into a new employment agreement. Gorman refused, but continued working as a MECA employee.

[¶ 5] Between 1999 and 2000, MECA became concerned about the weak performance of the Ellsworth office, which was losing revenue because the medical staff members were not seeing as many patients as possible and overhead was high. In May 2000, MECA approached a local ophthalmologist to determine whether he would like to associate with MECA, but he was not interested.

[¶ 6] By fall 2000, MECA had decided to sell the Ellsworth practice. The parties disputed whether Gorman and Cravey planned or intended to purchase the practice or its assets, and the court found that MECA provided "the more accurate rendition of the facts." The parties agree, however, that no purchase and sale agreement was ever signed.

[¶ 7] MECA sent a termination letter to Cravey on September 29, 2000, and to Gorman on October 26, 2000. Both letters indicated a termination of employment effective January 1, 2001. As of January 1, 2001, Gorman and Cravey continued to serve the same MECA patients in the same location under the name of Downeast Eye M.D. This change in name was announced to prior patients and to the public, in part through an advertisement that was approved by MECA. Gorman and Cravey

rented from MECA its premises, equipment, and the use of its patient charts for $65,000 from the period of January through October 2001. During this time, MECA was looking for a tenant for the other half of the building or to sell the building in which Downeast Eye was operating.

[¶ 8] Gorman and Cravey, doing business through Downeast Eye, moved off the premises to a new building on November 1, 2001, leaving most of the older equipment behind. Although the court found that Gorman and Cravey took the patient files with them, the parties agree on appeal that Gorman and Cravey did not physically take the files with them when they vacated the premises.

[¶ 9] MECA filed a complaint against Gorman and Cravey in October 2002, alleging seven counts against Gorman: (1) the breach of the noncompetition covenant in her contract; (2) the breach of her fiduciary duty of loyalty to MECA; (3) unjust enrichment; (4) fraudulent misrepresentation; (5) conversion of patient charts and files; (6) breach of contract for retaining patient charts and files after the termination of her employment; and (7) violation of the duty of good faith and fair dealing.[1]

[¶ 10] At the end of the jury-waived trial, MECA withdrew counts five and six, alleging conversion and breach of contract for taking the patient charts and files, because, as noted by its counsel, "those appear[ed] to be based on facts which [MECA] did not . . . have proof for." The court thereafter entered a judgment in favor of MECA on counts three and four, alleging unjust enrichment and fraudulent misrepresentation, respectively. The court acknowledged that MECA had with-

1. The complaint also alleged claims against Cravey, but the court found in Cravey's favor

on all counts and Cravey is not a party to the present appeal.

drawn counts five and six, alleging conversion and breach of contract for taking patient files, and found for Gorman on all other counts. In doing so, it found that, on count one, Gorman did not breach the noncompetition covenant because by the time MECA sought to enforce it, MECA was no longer doing business in the Ellsworth area; on count two, Gorman did not breach a fiduciary duty because she was not a MECA employee at the relevant times; and on count seven, Gorman did not violate the duty of good faith and fair dealing because the transaction was not subject to the Uniform Commercial Code.

[¶ 11] Regarding count three, the court found that Gorman was unjustly enriched because Gorman "took over all of MECA's patients in a new location with more modern equipment" and was "almost immediately ... able to turn the practice into a handsome moneymaker." The court specifically found that Gorman "has continued possession of all of the [patient] charts without any further payment to [MECA]." The court additionally found, on count four, that Gorman was liable for fraudulently misrepresenting to MECA that she would purchase the practice when she had no intent to do so, which resulted in a transfer of good will to Gorman without any compensation.

[¶ 12] The judgment included general findings for purposes of all the alleged causes of action. Significantly, the court found "by a preponderance of the evidence that [MECA's] version of what was intended and what transpired ... is the more accurate rendition of the facts." It also stated that it "was more impressed with the accuracy and credibility of the version of events related by [MECA]."

[¶ 13] In determining damages based on these findings, the court concluded that the real value of the practice lay in its good will as represented by the patient charts; it therefore fixed damages based on the value of the charts. The court relied on the testimony of one of MECA's owners that there were 11,784 active patient charts in the MECA office before Downeast Eye took over. It multiplied that number by the fifteen-dollar copying fee MECA charged its patients who wished to obtain their own charts upon the dissolution of the MECA office. Accordingly, the court awarded damages of $176,760. This appeal followed.

## II. DISCUSSION

### A. Fraudulent Misrepresentation

#### 1. Burden of Proof for Fraudulent Misrepresentation

[¶ 14] Gorman contends that the court employed a preponderance of the evidence burden of proof, but that the proper burden of proof was clear and convincing evidence. MECA responds that the court applied the proper burden of proof because it alleged ordinary common law fraud, not any of the types of fraud that must be proved by clear and convincing evidence.

[¶ 15] Although Gorman provided the trial court with the proper burden of proof in her trial brief and her post-trial brief, she did not present the argument to the court through a post-judgment motion. *See, e.g.,* M.R. Civ. P. 52, 59, 60. If the parties disputed a finding of fact without making a motion for findings of fact pursuant to Rule 52, we would assume that the court found all facts necessary to support its decision. *See Bell v. Bell,* 1997 ME 154, ¶ 4, 697 A.2d 835, 836. In the present case, however, the asserted error is an error of law that Gorman argued in her briefs to the trial court; accordingly, we review the court's application of the burden of proof de novo. *See Steelstone Indus., Inc. v. McCrum,* 2001 ME 171, ¶ 6, 785 A.2d 1256, 1258; *Emerson v. County*

*Concrete & Constr. Co.*, 614 A.2d 549, 550 (Me.1992).

[¶ 16] The elements of fraudulent misrepresentation must be proved by clear and convincing evidence. *St. Francis De Sales Fed. Credit Union v. Sun Ins. Co. of N.Y.*, 2002 ME 127, ¶ 26, 818 A.2d 995, 1003; *Mariello v. Giguere*, 667 A.2d 588, 590 (Me.1995). Although we held in *Petit v. Key Bank of Maine*, 688 A.2d 427, 431 (Me.1996), that we would not require clear and convincing evidence to prove the element of fraud in a claim of tortious interference with an advantageous economic relationship, we also acknowledged that *fraudulent misrepresentation* claims do require proof by clear and convincing evidence. *Id.* (stating that certain civil actions alleging fraud require proof by clear and convincing evidence and citing *Arbour v. Hazelton*, 534 A.2d 1303, 1305 (Me.1987), a fraudulent misrepresentation case).

[¶ 17] The court here made its factual findings for purposes of its judgment as a whole by a preponderance of the evidence and did not signal in any way that it was employing a higher burden of proof for the fraudulent misrepresentation claim. The court's acknowledgment that the case presented contradictory evidence on the material facts counsels us against inferring that the court would have made the same findings of fact if it had applied the clear and convincing evidence standard. Accordingly, it cannot be said that the error in applying the burden of proof was harmless. *See Emerson*, 614 A.2d at 550 (holding that the application of the improper standard of proof required that an order of attachment be vacated); *In re Application of Hughes*, 594 A.2d 1098, 1101–02 (Me. 1991) (vacating and remanding decision on bar application because the single justice applied the wrong standard of proof).

[¶ 18] Ordinarily, we remand in such circumstances for further consideration and for application of the more stringent burden of proof. We would vacate the judgment on the fraudulent misrepresentation count without remand, however, if we were to conclude, as Gorman argues, that no reading of the evidence could support a finding that Gorman was liable for fraudulent misrepresentation, regardless of the burden of proof.

2. Record Regarding the Fraudulent Misrepresentation Claim

[¶ 19] MECA's claim of fraudulent misrepresentation requires proof by clear and convincing evidence

"(1) that [Gorman] made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing [MECA] to act in reliance upon it, and (5) [MECA] justifiably relied upon the representation as true and acted upon it to [its] damage."

*Mariello*, 667 A.2d at 590 (quoting *Guiggey v. Bombardier*, 615 A.2d 1169, 1173 (Me.1992)). Evidence is clear and convincing if "the factfinder could reasonably have been persuaded that the required findings were proved to be highly probable." *Id.* (quotation marks omitted).

[¶ 20] Gorman argues only that MECA failed to establish, applying either burden of proof, the final element of fraudulent misrepresentation—that MECA justifiably relied on her representations to its detriment.

[¶ 21] There is evidence in the record that could support a finding that MECA relied on Gorman's representations. MECA witnesses testified that MECA did not seek any other buyers after it obtained Gorman's assurance that she intended to purchase the practice; it prepared to lease out the remaining space in its building; it

allowed Gorman continued access to patient files; and it advertised Gorman's new practice. This conduct could persuade the court, by clear and convincing evidence, that MECA relied on Gorman's representations that she would purchase the practice and its assets.

[¶ 22] Regarding whether MECA's reliance on Gorman's representations was *justified,* the record is less compelling, but nonetheless warrants remand. Because the court found that MECA provided the more credible evidence, we conclude that it would be possible for the court to find, by clear and convincing evidence, that MECA justifiably relied on Gorman's conduct. We cannot determine from the current record whether, in applying the appropriate burden of proof, the court would find that MECA justifiably relied on Gorman's representations or that it suffered a detriment by relying on her representations. In these circumstances, we remand the matter to the trial court for it to make factual findings applying the clear and convincing evidence burden of proof.

B. Unjust Enrichment

[¶ 23] The court found that Gorman was unjustly enriched because she quickly made a profit by taking MECA's patients and she unjustly took the benefit of MECA's good will, as represented by its patient charts. The court explicitly found that Gorman obtained "continued possession of all of the [patient] charts without any further payment to [MECA]." The parties agree that the finding that Gorman took patient charts is clearly erroneous because it is unsupported by competent evidence in the record. *See D'Angelo v. McNutt,* 2005 ME 31, ¶ 6, 868 A.2d 239, 242.[2]

[¶ 24] Although MECA argues that the error in finding that Gorman took patient files was harmless, Gorman contends that the error was prejudicial because she gained no more good will from using the charts during the rental period than she legitimately developed as a MECA employee before starting Downeast Eye. Gorman also argues that she gained no unjust benefit because, as the court explicitly found, Gorman paid for the use of the charts as part of her rental agreement.

[¶ 25] We examine the evidence offered in support of the unjust enrichment claim to determine whether the court's erroneous factual finding was harmless or whether it instead affected the substantial rights of the parties. *See* M.R. Civ. P. 61. If we conclude that the error was prejudicial, we must determine whether to remand the claim to the Superior Court. To make this determination, we will consider whether the record, viewed in MECA's favor, can possibly support each element of the unjust enrichment claim.

[¶ 26] To establish unjust enrichment, the complaining party must

establish that: (1) it conferred a benefit on the other party; (2) the other party had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value.

*Tucci v. City of Biddeford,* 2005 ME 7, ¶ 14, 864 A.2d 185, 189.

[¶ 27] At the heart of an unjust enrichment claim, therefore, is the requirement of proof that a benefit was conferred. Here, as the parties have agreed, the court

---

2. Because the parties concede the clear error, we do not address Gorman's failure to make a post-judgment motion to bring the issue to the trial court's attention. *See, e.g.,* M.R. Civ. P. 52, 59, 60.

erred in finding that Gorman received a benefit from MECA by physically taking patient files. It is unclear from the record whether the court would have found that MECA conferred a benefit on Gorman based on other evidence in the record. On this record, the court was certainly not compelled to find that MECA conferred a benefit on Gorman. Therefore, we cannot conclude that the factual error in finding that Gorman took patient files was harmless. Accordingly, we remand the unjust enrichment claim to the Superior Court for further action.

[¶ 28] On remand, if the court finds liability arising from unjust enrichment or fraudulent misrepresentation, it must determine anew whether damages were proved and in what amount.[3]

The entry is:

Judgment against Timber Gorman on counts three and four, alleging unjust enrichment and fraudulent misrepresentation, vacated and remanded for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed.

---

3. The court would also have to determine whether to allow an offset for the amount Gorman paid MECA in rent for use of the premises, equipment, and patient files.

Gorman makes the additional argument that the court erred in making a single finding of damages based on multiple theories of liability. We note, for purposes of remand, that although the court must consider the measure of damages for each cause of action the measure could be identical for each.