STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-06-42
REC-CUm-10/25/2006

WILLIAM WARD,
NORENE WARD,
and
SUMMIT FAB, INC.

Plaintiffs

v.

ALFRED B. GLOVER,
LILLIAN S. GLOVER,
KENNETH HALL,
MAINE COAST PROPERTIES
and
PROMENADE EAST
CONDOMINIUM ASSOCIATION,
INC.

Defendants

ORDER ON PROMENADE
EAST CONDOMINIUM
ASSOCIATION, INC.'S
MOTION FOR JUDGMENT
ON THE PLEADINGS AND
SUMMARY JUDGMENT

DONALD L. GARBRECHT
LAW LIBRARY

DEC 0 8 2006

Before the Court is Defendant Promenade East Condominium

Association's ("Association") motion for judgment on the pleadings on Count I

(Failure to Disclose), Count IV (Violations of the Maine Unfair Trade Practices

Act), Count V (Breach of Contract), Count VI (Violation of Maine Condominium

Act 33 M.R.S.A. § 1604-112), Count VII (Violation of Maine Condominium Act 33

M.R.S.A. § 1604-113), and Count VIII (Violation of Maine Condominium Act 33

M.R.S.A. § 1604-108), and summary judgment on Count III (Fraudulent

Misrepresentation) and Count III[1] (Negligent Misrepresentation) of William

Ward, Norene Ward, and Summit Fab, Inc.'s ("Plaintiffs") amended complaint.

---

[1] In Plaintiffs' amended complaint, their Intentional Misrepresentation and Negligent
Misrepresentation causes of action are both labeled "Count III."

1

The only remaining count in the amended complaint, Count II, does not implicate the Association.

## UNDISPUTED FACTS AND PROCEDURAL HISTORY

The Association is a Maine non-profit corporation that manages a condominium building ("Building") in Portland, Maine. The Building has a brick façade with a history of water infiltration problems dating back to when the complex opened in the 1970s. In February 2004, Becker Engineering ("Becker") evaluated the Building's exterior. This evaluation exposed structural problems and resulting safety issues with the facade. In May 2004 Becker conducted a second study on the Building's exterior. This study led Becker to suggest that, due to safety concerns, the issues related to the façade should be addressed immediately. Following a meeting with representatives of the Association, Becker conducted one more study of the Building's façade on July 30, 2004. This study found numerous examples of poor workmanship on the façade, leaving its prefabricated brick panels in an unsafe condition. These studies made the Association aware that there were serious concerns about the structural integrity of the brick façade of the building. In a step toward addressing those concerns, the Association began interviewing façade specialists in August 2004.

In September 2004, Alfred and Lillian Glover ("Glovers"), the owners of unit #226 in the Building, put their unit up for sale with the help of their broker Kenneth Hall ("Hall"). Plaintiffs, with the assistance of their broker John Bernier ("Bernier"), made a purchase offer to the Glovers for unit #226. The Glovers accepted Plaintiffs' purchase offer without revision. The purchase offer contained no right to inspect. Plaintiffs' only personal viewing of the Building consisted of walking up the stairs and looking at the unit. Plaintiffs never toured the rest of

2

the condominium property, did not view the exterior of the building and did not ask any questions of the Glovers at that time.

In connection with the agreement between the Glovers and Plaintiffs, the Association prepared a resale certificate. The resale certificate included a section stating "Capital Expenditures Anticipated By the Association: There are (no/yes) capital expenditures currently anticipated by the Association." The resale certificate then included a short space for a response. In that space was written "exterior wall repair + water proofing – cost unknown – in engineering study."[2] Plaintiffs had ten days from receipt of the certificate to terminate the contract.

Prior to closing, Bernier posed six written questions relating to the resale certificate to Hall. Hall's answers to these questions were based upon responses received from the Association's office manager. The second question posed by Plaintiffs stated, "Monthly Common Expense Assessments. What are new monthly common expense assessments for time beginning October 1, 2004? What has been the history of assessments for last five years. Is there a cap on condo fee increases?" Hall's response was "[t]here is no anticipate [sic] increase in condo fee. The fee is voted on annually. Very small increases since 2000." Also prior to closing, Mr. Ward spoke with Brian Gagne who performed electrical work for the Association. Although it is disputed what Mr. Gagne said, it is undisputed that he at least made some reference to problems with the Building.

Based on the language in the resale certificate and the conversation with Mr. Gagne, Mr. Ward instructed Bernier to make inquiries of the Glovers and

---

[2] It is disputed whether the statement said "exterior wall repair + water proofing . . . " or "exterior wall repair – water proofing . . . " Exhibit C contains the document with this statement hand written on it. It appears that it is a "+" not a "-" but interpretation of this symbol does not affect the outcome of any issue in the case.

Hall. When Bernier did so, he was told to contact the Association. The existence and substance of these inquiries and who they were made upon are disputed. At no time did Bernier or Plaintiffs ask the Association for copies of its engineering studies on the façade. These studies would have been available to Bernier upon request.

Plaintiffs closed on the sale of unit #226 in October 2004. In April 2005, the Association received a report from an engineering firm that specializes in building façade problems confirming the previous assessment of Becker that wall repairs were necessary. At that time, the façade specialist made specific recommendations for repairs, including providing the Association with its first cost estimate for the repairs. On June 19, 2006, the Association approved a $45,699 assessment against unit #226 for its share of the cost of the wall repair. Had Bernier known of the results of Becker's studies, he would have recommended that Plaintiffs not go through with their purchase. Had Plaintiffs known about these problems, they would not have closed on the purchase.

Plaintiffs filed a nine-count amended complaint against the Glovers, Hall, and the Association on March 14, 2006. Of the nine-counts, five are asserted against the Association. Of those five counts, the Association moves for judgment on the pleadings on Count I (Failure to Disclose) and Count VIII (Violation of Maine Condominium Act, 33 M.R.S.A. § 1604-108).[3] In addition, the Association moves for summary judgment on Count III (Intentional

_____

[3] In its motion, the Association argues for judgment on the pleadings on counts V-VII in addition to those mentioned above. Plaintiffs state that those counts are not applicable to the Association under their amended complaint. As a result, those counts, namely breach of contract and breaches of express and implied warranties in violation of the Maine Condominium Act, are not addressed here.

Misrepresentation), Count III (Negligent Misrepresentation) and Count IV (Violations of the Maine Unfair Trade Practices Act).[4]

## DISCUSSION

### I. Judgment on the Pleadings

#### A. Standard of Review

A "motion for judgment on the pleadings is the functional equivalent of a motion to dismiss for failure to state a claim." *Stevens v. Bouchard*, 532 A.2d 1028, 1029 (Me. 1987). The Court must "examine the complaint in the light most favorable to the plaintiffs to determine whether it alleges the elements of a cause of action or facts entitling the plaintiffs to relief on some legal theory" and "assume that all factual allegations in the complaint are true." *Id.* at 1030.

#### B. Count I (Failure to Disclose)

Plaintiffs make no argument in opposition to the Association's motion for judgment on the pleadings regarding this count. To briefly address its substance, for a party to be liable for a failure to disclose, there must be a duty to disclose the information in question. There is no relationship, contractual or otherwise, alleged by Plaintiffs under which such a duty might arise.

#### C. Count VIII (Violation of Maine Condominium Act 33 M.R.S.A. § 1604-108)

Under 33 M.R.S.A. § 1604-108, "a unit owner shall furnish to a purchaser before execution of any contract for sale of a unit . . . a reasonably current certificate" containing twelve statements, including a statement of any capital

---

[4] The Association originally moved for judgment on the pleadings on Count IV. Arguments by the parties, however, incorporated matters outside the pleadings. As a result, pursuant to M.R. Civ. P. 12(c), the Court notified the parties that it would treat the Association's motion on Count IV as a motion for summary judgment and permitted the submission of additional materials in light of this change in procedural posture.

expenditures anticipated by the Association. It was the Association's responsibility to "within 10 days after a request by a unit owner . . . furnish a certificate containing the information necessary to enable the unit owner to comply with [the statute]." 33 M.R.S.A. § 1604-108(b).

The Association argues that the statute, by its plain meaning, creates no duty for the Association regarding the Wards as the unit buyer. Instead, the statute creates a duty for the Association to supply a resale certificate to the Glovers, as the unit owner, which the Association did. Plaintiffs make no argument countering the Association's assertion that the resale certificate statute creates no grounds for a cause of action by Plaintiffs against the Association. Plaintiffs argue only that the Association's statements in the resale certificate did not "accurately and fully disclose its anticipated capital expenditures." The plain language of the statute supports the position that the only duties created by this statute are those of a unit owner to provide a resale certificate to a potential purchaser and of a condominium association to provide a resale certificate to a unit owner upon request.[5]

## II. Summary Judgment

### A. Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Farrington's Owners' Ass'n v. Conway Lake Resorts*, 2005 ME 93, ¶ 9, 878 A.2d 504,

---

[5] Even if there were a duty, to maintain a cause of action Plaintiffs need prove that the Association's statement regarding anticipated capital expenditures was false. For reasons discussed at length under the discussion of Intentional and Negligent Misrepresentation, the Association's statement was not erroneous.

6

507. On a summary judgment motion, the evidence must be viewed in the light that is most favorable to the non-moving party. *Id.*

### B. Count III (Fraudulent/Intentional Misrepresentation)

In order to succeed on its fraudulent misrepresentation claim, Plaintiffs must prove "(1) that [the Association] made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing [Plaintiffs] to act in reliance upon it, and (5) [Plaintiffs] justifiably relied upon the representation as true and acted upon it to [their] damage." *Me. Eye Care Assocs., P.A. v. Gorman*, 2006 ME 15, ¶ 19, 890 A.2d 707, 711 (quoting *Mariello v. Giguere*, 667 A.2d 588, 590 (Me. 1995)). Plaintiffs must prove each element by clear and convincing evidence. *Id.* ¶ 16, 890 A.2d at 711. Evidence is "clear and convincing" if a factfinder could reasonably determine that the required findings are proved to be highly probable. *Id.* ¶ 19, 890 A.2d at 711.

### 1. False Representation

A plaintiff may not satisfy this element of a fraudulent misrepresentation claim by alleging omissions by silence unless there was a fiduciary relationship between the plaintiff and defendant. *Binette v. Dyer Library Ass'n.*, 688 A.2d 898, 903 (Me. 1996). In the case of conscious half-truths, however, ""[a] representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter[s]' is fraudulent." Zillman, Simmons & Gregory, Maine Tort Law § 11.05 (1999) (quoting RESTATEMENT (SECOND) OF TORTS § 529 (1977)).

Plaintiffs argue that a number of different statements qualify as false representations by the Association. First, they argue that the language on the

7

resale certificate stating, "exterior wall repair + water proofing – cost unknown – in engineering study" misleadingly minimized the problem with the façade because, at that time, the Association had multiple opinions from Becker that major repairs were necessary.

The statements in the resale certificate are not fraudulent. Taken in a light most favorable to Plaintiffs, the Association notified them of the existence of problems with the façade, that there was at least one engineering study conducted on this problem and that the Association did not know what the repair costs would be. These statements are true and not misleading. Rather than minimizing the costs, these statements take no position. This was not fraudulent as the Association did not know what the repair cost would be.

The heart of Plaintiffs' case on this element is conversations that Plaintiffs' broker allegedly had with members of the Association. For instance, Bernier claims that Pauli Daniels, the condominium association manager, told him in a conversation about waterproofing efforts for the façade that "no expense assessment was being considered." In addition, Bernier states that, in a conversation with Bruce Hopkins, the immediate past president of the Association, Mr. Hopkins told him that the Association "was in the early stages of investigating" the maintenance issues with the façade. Lastly, Bernier states that James Zafirson, the president of the Association board of directors, told him that "one corner of the building exterior was leaking and studies were underway to assess if the building exterior has reached its useful life." When all these statements were allegedly made, the Association had already received the results of the Becker studies. The Becker studies were commissioned to determine the cause and extent of damage to the Building's façade. These studies determined

that faulty workmanship led to degradation of the structure of the façade such that there were serious concerns about its integrity. As a result, the Association began interviewing façade specialists to determine what repairs were necessary.

The Association's statements are not false representations. As an initial matter, it is unclear why a statement by the former president of the Association should be imputed against the Association. There is no claim that Bernier was led to believe that Mr. Hopkins had authority to speak for the Association. Because Mr. Hopkins was not an agent of the Association and because there is no indication that he was cloaked in apparent authority to speak for it, his statements cannot be imputed to the Association.[6]

Neither of the remaining two statements is affirmatively false or misleading. Mr. Zafirson told Bernier about the leakage problem with the façade, told him that studies were underway regarding this problem and even notified Bernier that the purpose of the studies was to determine whether the façade was nearing the end of its useful life. Rather than misleading Bernier, this information accurately summarized the situation. Regarding Ms. Daniels's statement, context is important. Plaintiffs admit that, along with her statement that there was no expense assessment being considered, Ms. Daniels stated "that there was a leaking around the windows of a sidewall on the Walnut street side of building 1 in the condominium complex . . . [and that] the [Association] would be continuing with waterproofing efforts on the Walnut street wall." (Pls.' Opp'n to Def's Mot. Summ. J. at 5.) From this, it is clear that Ms. Daniels did not imply that

---

[6] The Association argues briefly that, similar to Mr. Hopkins, Ms. Daniels had no authority to speak for the Association. Because Ms. Daniels was the Association's manager, it was reasonable for Bernier to assume she had authority to speak for the Association on the Building's condition.

no façade repairs would be necessary. In fact, she stated that there was a problem and that efforts were being made to resolve this problem. The only reasonable interpretation of Ms. Daniels's statement is that no expense assessment was being prepared at that time. This statement was true because, at the time Ms. Daniels made her comments, neither she nor anyone else connected with the Association had been presented with a cost estimate for façade repair work. Absent a cost estimate, the Association had no basis upon which to consider an expense assessment.[7]

The last possible source of a false representation was a statement by an Association representative in a memo, given in response to specific questions by Plaintiffs' broker, which was then passed on to Bernier. Plaintiffs argue that this statement, that there were no anticipated increases in the condominium fee, was a false representation in light of what the Association knew about the necessity for repair work on the façade. Plaintiffs, however, ignore the context of that statement. The question posed to the Association under the heading "Monthly Common Expense Assessments" was "[w]hat are new monthly common expense assessments for time beginning October 1, 2004?" From this question, it is clear that the response was meant to assert that there were no anticipated increases in the monthly condominium fee. Because this statement was not misleading, and because none of the other statements addressed by the Plaintiffs, either

---

[7] There is no dispute that prior to receipt of the façade specialist's report in April 2005 the Association had never been presented with a dollar figure for potential repairs to the façade. An "expense assessment" is the share of common condominium expenses, such as repairs done to the exterior wall of a condominium building, that an individual unit owner is responsible for. *See* 33 M.R.S.A. § 1603-115. Logically, there can be no expense assessment considered until a condominium association has a dollar figure to work from in determining each individual unit owner's share of that total.

separately or in concert, are misleading, no factfinder could reasonably be persuaded that the Association has made false representations.

### 2. Inducing Reliance

Plaintiffs argue that the Association made its allegedly false representations for the purpose of inducing their reliance. The Association's motive, according to Plaintiffs, is that the prospect of a serious repair job to the façade, if fully disclosed to potential purchasers of condominium units, would have impaired the marketability of all the units in the condominium.

Plaintiffs cite no cases in which a court found that a condominium association induced reliance on false statements in order to facilitate the sale of units by unit owners. Logically, it does not follow that the Association, even if it made false representations, would have done so for the purpose of inducing a buyer to rely on those representations in buying a unit. There is no motive for the Association to do so. They are a non-profit organization that does not receive a percentage of the sales price, or any other benefit, from condominium owners selling their units. As the Association admits, however, "one who believes that another is substantially certain to act in a particular manner as a result of a misrepresentation intends that result, although he does not act for the purpose of causing it and does not desire to do so." *McKinnon v. Tibbetts*, 440 A.2d 1028, 1030-31 (Me. 1982) (quoting RESTATEMENT (SECOND) OF TORTS § 531, Comment c (1977)). Drawing all inferences in favor of Plaintiffs, if they could have met their burden regarding the other elements of fraudulent misrepresentation, summary judgment against them on this element would be inappropriate.

### 3. Justifiable Reliance

The arguments by both sides are extremely spare on this element. Neither cites authority for what constitutes justifiable reliance. By their own admission, Plaintiffs did not examine the condominium other than the inside of the unit they purchased. Further, although Plaintiffs were alerted to possible problems with the facade through the resale certificate and through conversations their broker allegedly had with Association members, neither they nor their broker took steps to examine the engineering studies.

"If a party has knowledge of such facts as would lead a fair and prudent man, using ordinary caution, to make further inquiries, and he avoids the inquiry, he is chargeable with notice of the facts which by ordinary diligence he would have ascertained. He has no right to shut his eyes against the light before him." *Gagner v. Kittery Water District*, 385 A.2d 206, 207-08 (Me. 1978) (quoting *Knapp v. Bailey*, 79 Me. 195, 204, 9 A. 122, 124 (1887)). Because the information detailing what the Association knew regarding the façade was always available to the Plaintiffs, and because the Association made known to Plaintiffs that the engineering studies existed, a factfinder could not reasonably find that Plaintiffs justifiably relied on a few brief conversations between their broker and Association members in determining whether the damage to the building was sufficiently severe to affect their purchase decision.

### C. Count III (Negligent Misrepresentation)

Maine has explicitly adopted the Restatement's approach to the tort of negligent misrepresentation. *Binette*, 688 A.2d at 903. In order to prove negligent misrepresentation, Plaintiffs must show that (1) there was a transaction in which the Association had a pecuniary interest (2) the Association provided false information to Plaintiffs in connection with the transaction (3) without exercising

reasonable care or competence and (4) Plaintiffs justifiably relied on that false information in that transaction. *See id.*

Most of these elements overlap with the elements for intentional misrepresentation in whole or in part. Regarding the pecuniary interest element, contrary to Plaintiffs' assertion, the Association does not admit in its summary judgment motion that it had a pecuniary interest in the transaction between the Plaintiffs and Glovers. In contrast, it specifically states that "the Association had no pecuniary interest in the transaction between the Glovers and the Wards." What the Association admits is that it had a pecuniary interest in the unit itself by virtue of its right to collect fees and assessments from the unit's owner. As discussed earlier, it makes no difference to the Association who owns unit #226. As a result, it had no pecuniary interest in the sale of that unit.

Regarding the false information element, this involves identical issues to the false representations element for intentional misrepresentation discussed at length. Of note, however, is the fact that Plaintiffs do not argue against the Association's assertion that, even if the Association had provided false information, Plaintiffs would be barred from satisfying this element due to Plaintiffs' contributory negligence. The argument on contributory negligence in this case mirrors the argument over justifiable reliance above. Because there was no false information provided by the Association, however, the Court need not reach the contributory negligence argument.

The final two elements for negligent misrepresentation can be quickly dispatched. The reasonable care and competence element relates to supplying false information to Plaintiffs in connection with their transaction. Because there was no false information supplied, this element is not satisfied. Lastly, the

justifiable reliance element is not present for the same reasons discussed in Section B3 above.

### D. Count IV (Maine Unfair Trade Practices Act)

Under the Maine Unfair Trade Practices Act ("UTPA"), "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful." 5 M.R.S.A. § 207. As a threshold matter, the Association denies that UTPA applies because it was never engaged in "trade or commerce" in relation to Plaintiffs. UTPA defines "trade or commerce" as including the "offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this State." 5 M.R.S.A. § 206(3).

Defendant asserts that the Association does not provide any property, service or commodity in any kind of exchange and therefore is not engaged in trade or commerce. Plaintiff argues that, because the Association handles all financial and property issues for owners of the condominiums for a fee, and because the Association is involved in the sale of units due to its responsibility for providing a resale certificate, it is engaged in trade or commerce.

While UTPA's definition of trade and commerce is broad, it does not cover the actions of the Association. In a Connecticut Supreme Court case involving an unfair trade practices statute virtually identical to UTPA, the court held that managing a condominium association does not constitute trade or commerce. *Rafalowski v. Old Country Rd.*, 714 A.2d. 675, 676-77 (Conn. 1998). UTPA is focused on preventing entities that sell products and services from dealing with purchasers in an unfair or deceptive way. The Association does not

**14**

provide products or services. It is a non-profit organization that runs a condominium. To the extent its activities touch on anything related to the act of selling to a purchaser, it is only tangentially as a result of its statutory duty to provide resale certificates to unit sellers. This does not transform the Association into an organization engaged in trade or commerce.

The entry is:

> Defendant's motion for judgment on the pleadings on Count I (Failure to Disclose) and Count VIII (Violation of Maine Condominium Act) is GRANTED. Defendant's motion for summary judgment on Count III (Intentional Misrepresentation) and Count III (Negligent Misrepresentation) is GRANTED. Defendant's motion for judgment on the pleadings on Count IV (Violation of Maine Unfair Trade Practices Act) is treated as a motion for summary judgment pursuant to M.R. Civ. P. 12(c) and GRANTED.

Dated at Portland, Maine this _25th_ day of _October_, 2006.

Robert E. Crowley
Justice, Superior Court

15

ROBERT HATCH ESQ          *Of Hall &*
THOMPSON & BOWIE            *Maine Coast*
PO BOX 4630
PORTLAND ME 04112-4360




BRUCE MCLAUFLIN ESQ       *Of Promenade*
PETRUCCELLI MARTIN & HADDOW      *East*
PO BOX 17555
PORTLAND ME 04112-8555




GLENN ISRAEL ESQ   *Of (Hoven)*
BERNSTEIN SHUR SAWYER & NELSON
PO BOX 9729
PORTLAND ME 04104-5029




                          *PI (?)*
GERALD MAY ESQ
DAVID PERKINS ESQ
PERKINS OLSON
PO BOX 449
PORTLAND ME 04112-0449